## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
SHIRLEAN BESHIR,                              )
                                              )
                           Plaintiff,         )
                                              )
           v.                                 )   Civ.  No. 11- 1160 (KBJ)
                                              )
SARAH ("SALLY") JEWELL, SECRETARY,            )
DEPARTMENT OF THE INTERIOR,                   )
                                              )
                           Defendant.[1]      )
_____       )

## <u>MEMORANDUM OPINION</u>

Plaintiff Shirlean Beshir brings this action against the Secretary of the Interior,

alleging discrimination on the basis of her race, sex, and age, in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>, and the Age Discrimination

in Employment Act ("ADEA"), 29 U.S.C. § 621 <u>et</u> <u>seq.</u>  In her complaint, she contends

that she experienced disparate treatment based on her race and sex in violation of Title

VII (Count I); that she was subjected to a hostile work environment based on her race

and sex in violation of Title VII (Count II); and that she experienced disparate

treatment based on her age in violation of the ADEA (Count III).  Pending before the

Court is Defendant's motion for summary judgment [ECF No. 15].  Upon consideration

of the motion and associated submissions from the parties, the information provided at a

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary of the Interior has been
substituted for former Secretary Kenneth L. Salazar.

hearing on June 11, 2013, the entire record, the applicable law, and for the reasons that follow, Defendant's motion is **GRANTED**.

## BACKGROUND

The following facts are undisputed, unless otherwise noted.

Shirlean Beshir ("Beshir" or "Plaintiff") is an African-American woman who was fifty-one years of age during the summer and fall of 2007, the relevant period of the alleged discrimination.  (Defendant's Statement of Material Facts Not in Dispute ("Def.'s SMF") ¶¶ 2.)  From 1997 through 2008, Beshir worked at the Bureau of Land Management ("BLM"), a bureau of the Department of the Interior ("DOI"), in the Division of Regulatory Affairs.  (Id. at ¶¶ 1-2.) During the relevant period, Beshir was performing at the GS-13 level.  (Id. ¶¶ 5-6.)

In 2007, Beshir was the Division's Information Collection Clearance Officer, and as such, was responsible for preparing BLM's information collection clearance packages.  (Id. ¶ 10.)  Under the terms of the Paperwork Reduction Act of 1995 ("PRA"), 44 U.S.C. § 3501 et seq., federal agencies such as BLM are required to submit information collection clearance packages to the Office of Management and Budget ("OMB"), to provide, among other things, an estimate of the burden that certain information collection activities impose on the public and the federal government. (Def.'s SMF ¶ 8.)  Personnel at BLM formulated burden estimates using guidance provided by a responsible counterpart, or "desk officer," at OMB.  (See generally id. ¶¶ 12-13, 19, 39.)  Through most of 2007, Ruth Solomon was the OMB desk officer with

whom Beshir worked to prepare burden estimates for information collection clearance packages. (Def.'s SMF ¶ 12.)[2]

As Information Collection Clearance Officer, Beshir did not have the authority to submit these packages to OMB directly; rather, she was required to submit them to her supervisor, Ted Hudson, who submitted them to Don Bieniewicz, BLM's Information Collection Coordinator, for his review and approval. (Id. ¶¶ 3, 11.) Hudson and Bieniewicz are middle-aged Caucasian males. (Id. ¶¶ 3, 11).[3] Beshir alleges that she "heard management, including Hudson, express on several occasions that they felt the PRA was a 'crock' and that they didn't have to comply with it." (Compl. ¶ 7.) Nevertheless, Hudson reviewed the packages that Beshir prepared and Bieniewicz was then responsible for submitting the information collection clearance packages to OMB. (Def.'s SMF ¶ 11.)

<u>The Information Collection Clearance Packages Dispute</u>

In anticipation of an August 28, 2007, deadline for submission to OMB, Beshir drafted information collection clearance packages regarding the estimated burden of BLM's wild horses and burros adoption program. (Id. ¶ 15.) To calculate the burden of this program, Beshir estimated, among other things, the cost (in terms of both dollars and personnel hours) associated with completing and processing BLM's "Application for Adoption of Wild Horse or Burro." (Id. ¶¶ 8-9.) Beshir alleges that, in preparing the estimates, she was mindful of OMB desk officer Solomon's recent admonishments regarding the Agency's prior non-compliance with the PRA. (Id. ¶ 19.) Specifically,

---

[2] Solomon left the desk officer post at OMB in August of 2007, and Rob Johansson replaced her. (Def.'s Mot. Summ. J., Ex. 1; Ex. 2, "Beshir Dep.," Tr. 58:01-06.)

[3] The other relevant decision makers with respect to Beshir's discrimination claims are also Caucasian. (Def.'s SMF ¶ 4).

Beshir alleges that Solomon had informed her that the Agency "had been greatly underestimating the burden hours and costs in its PRA submissions" and that Solomon had instructed her to "use more realistic figures" and "not 'send [her] crap anymore.'" (Pl.'s Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") at 3.)

Beshir prepared the wild horse and burro PRA estimate packages and submitted them to Hudson several months in advance of the deadline. (Compl. ¶ 9; Def.'s SMF ¶ 15.) Hudson, in turn, submitted the information packages to Bieniewicz, but Bieniewicz was unable to review them until mid-August due to absences from work related to his wife's illness. (Def.'s SMF ¶ 16.) On August 17, 2007, after Bieniewicz reviewed the information packages, Bieniewicz and Beshir had an "angry conversation" about Beshir's calculations in the packages, which Bieniewicz thought were "outlandish[ly] high." (Id. ¶¶ 18, 20.) Beshir asserted her belief that the guidance Solomon provided mandated the seemingly high burden estimates. (Id. ¶ 19.) In an attempt to "mediate" between Beshir and Bieniewicz, Hudson scheduled a meeting for August 27, 2007, to discuss the burden calculations. (Id. ¶¶ 21-22.) Beshir was unable to attend this meeting due to previously scheduled leave and asked that the meeting be rescheduled. (Id. ¶¶ 21-23.) However, the meeting went forward without Beshir because Bieniewicz was otherwise unavailable due to his wife's illness. (Id. ¶¶ 23-24.) Beshir alleges that she "requested that Hudson not make the changes because the revised numbers were incorrect and contrary to OMB guidance, and that she would address the packages the following day, August 28, 2007." (Compl. ¶ 12.)

At the August 27, 2007, meeting, Hudson, Bieniewicz, and a member of BLM's wild horse and burro staff "discussed and analyzed the proper burden estimates" for the program, and Hudson made changes to the information packages in accordance with his understanding of these discussions. (Def.'s SMF ¶¶ 24-25.) Hudson left drafts of the modified information packages on Beshir's chair, along with instructions to make his changes and submit them to the Federal Register, as edited, the next day. (Id. ¶ 26.)

When Beshir arrived to work the next day, she was "upset" by the changes in her drafts. (Id. ¶ 28.) Beshir alleges that the "packages were not in the correct format and the numbers were all incorrect, and certain changes would render the documents incompatible with OMB computer software." (Compl. ¶ 13.) Beshir confronted Hudson and told him that the changes were "incorrect." (Def.'s SMF ¶ 29.) Beshir alleges that after she told Hudson about the problems, "Hudson began yelling at Beshir, saying that the Department had made a decision and that the packages had to be submitted promptly." (Compl. ¶ 13.) Hudson and Beshir proceeded to have a heated conversation about Hudson's proposed changes, which concluded with Hudson threatening Beshir with insubordination if she did not follow his instructions. (Def.'s SMF ¶¶ 29, 33, 34.) In response, Beshir stated, "you do what you have to do and I will do what I have to do." (Id. ¶ 33.)

Later that day, Beshir met with one of Hudson's supervisors, Bob Johns, to discuss the issue, telling Johns that, as a result of Hudson's revisions, the information packages were formatted incorrectly and the burden and cost estimates were too low. (Id. ¶¶ 35-36.) Beshir also expressed to Johns her concern that submitting the edited information packages would land BLM "in trouble" with OMB. (Id.) After discussing

the issue with Hudson, Johns instructed Beshir to follow Hudson's instructions because he was her supervisor. (Id. ¶ 37.) In light of the continuing dispute about the burden estimates, BLM received a 30-day extension from OMB to submit the information packages. (Id. ¶ 38.)

On September 4, 2007, Hudson sent an email to Beshir and others at BLM, to inform them that the "new desk officer at OMB, Rob Johansson, has agreed to meet with us [on September 11, 2007] . . . to discuss information collection issues and to help us get on the same page in understanding what OMB wants from us." (Def.'s Mot. Summ. J, Ex. 5) Prior to the meeting with Johansson, on September 5, 2007, Beshir met with Johns and Celia Boddington, another one of Hudson's supervisors, to discuss information collection issues. (Def.'s Mot. Summ. J., Ex. 6.) After this meeting, Beshir described her understanding of the guidelines in an email to Johns and Boddington:

> I was directed and given OMB guidelines on how the BLM should calculate the burden hour cost from the previous Interior Desk Officer, Ruth Solomon. We developed the following: Use as a minimum an estimated per hour cost rate of $75 for the public and $75 for the Federal Government. Once I meet with the various Division Managers responsible for the information collection that $75 rate could increase, however, it will never be less than $75 per hour once we incorporate all the factors needed to collect the information.

(Id.)

On September 11, 2007, Johansson met with Beshir, Hudson, Boddington, and others at BLM, to discuss criteria for burden information collection. (Def.'s SMF ¶ 42.) The parties dispute what occurred during the meeting. According to Beshir, Johansson asserted that he "could not provide any guidance on a specific package until he had it

on his desk," and that Beshir should "continue to follow Solomon's instructions" until she received specific instructions from him. (Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute ("Pl.'s SMF") ¶ 42.) In Defendant's view, Johansson addressed questions about burden calculations and demonstrated how to calculate burden estimates, using a template from the Department of Agriculture. (Def.'s SMF ¶ 42.) In an email sent to Johansson on September 12, 2007, Hudson "compile[d] the results of that meeting as a new set of guidelines on calculating burden hours and costs" into a document entitled "Summation of Meeting with OMB Regarding Information Collection Procedures, September 11, 2007," and asked Johansson to review the document "to make sure [Hudson] ha[d] everything correct." (Def.'s Mot. Summ. J., Ex. 7.) On September 13, 2007, Johansson replied to Hudson with edits to Hudson's document. (Def.'s Mot. Summ. J, Ex. 8A.)

On September 20, 2007, Hudson sent the edited guidelines to Beshir in an email with the subject line, "Direct order on information collections . . . ." (Def.'s Mot. Summ. J., Ex. 9.) Hudson wrote:

> I am directing you to enter new numbers in the supporting statements and in ROCIS for the subject three information collections up for review. These numbers must be compiled and calculated according to the guidelines provided by OMB and attached hereto.
>
> ....
>
> Please understand that your failure to comply with this direct order could result in formal disciplinary action.
>
> Management has gone to great lengths over the past month to reach an understanding with the Department and with OMB as to what is required, and to acquaint you with what we must do to get these clearance packages to OMB for approval, including arranging meetings with OMB, the

Department, and the experts on the issue from other Bureaus
within the Department. It is now time to get the work done
with no further delay.

(Id.)

Beshir did not make the changes, as ordered. (Def.'s SMF ¶ 50.) As she later
explained in a response to an interrogatory relating to her complaint before the Equal
Employment Opportunity Commission, she viewed Hudson's directive as "an illegal
order to enter information I believed was incorrect because it did not follow the
guidance/instructions of the OMB Interior Desk Officer, Ruth Solomon." (Def.'s Mot.
Summ. J., Ex. 10, "Beshir Response to Interrogatories," at 4-5.) Beshir continued:

Also, I did not make changes to the information collection
documents because several of the requested changes would
not work in the ROCIS computer system. . . . I honestly
believed that Mr. Hudson's changes would result in BLM
failing to comply with the PRA. I will not perform shoddy
work that I know to be incorrect simply because my
supervisor tells me to. I would hope that BLM does not
want drones that never question orders no matter how illegal
or impossible to implement. I took pride in my work and
have always performed at a high level as demonstrated by
the advancements and commendations over the years at the
BLM. . . . Given the packages had always cleared OMB
when I followed the guidance/instructions provided, that is
why I hope you understand why I would not enter
incompatible information into the system and why I would
not change the way I perform the job unless I had been
shown good reasons to do so. "Because I said so" by Ted
Hudson is not a good reason to me.

(Id.)

### Beshir's Request for a Detail

On September 25, 2007, Beshir asked Hudson to be temporarily reassigned, or
"detailed," to the Division of Recreation. (Def.'s SMF ¶ 54.) Hudson advised Beshir
that he did not object to her request, as long as she completed three outstanding

information collection packages before being detailed. (Id. ¶ 55.) Hudson also informed Beshir that the BLM's information collection duties would not transfer with her while she was on detail. (Id. ¶ 56.)

<u>The Argument of October 4, 2007, and Beshir's Leave and Suspension</u>

On October 4, 2007, Hudson and Beshir had an argument about work that Hudson had done on two oil and gas information collection packages, which had been assigned to Beshir. (Id. ¶ 57.) During the course of this argument, Beshir "got mad" because she believed that Hudson had told Bieniewicz that Beshir was not doing her job. (Id. ¶ 58.) As Hudson was leaving Beshir's cubicle, Beshir "mutter[ed]" to herself and said, "This is out of control—They will all have to pay for what they have done to me." (Def.'s Mot. Summ. J., Ex. 10, "Beshir Response to Interrogatories," at 7.) Beshir maintains that, in making this statement she was referencing "an EEO complaint" that she had made and that she "believed that this would lead to the management officials involved being held accountable for their actions." (Pl.'s SMF ¶ 61.)

Following this argument, that same morning, Hudson wrote in an email to Johns and others:

> This morning Ms. Beshir chased me away from her desk, angry because I had done the two discontinuations.
>
> After I left, she muttered, quote: "You are gonna pay for what you did to me. You are gonna get yours."
>
> I take this as a direct threat.
>
> I went back to her cubicle and told her in a forceful voice: "There is no need for a meeting. You are

> going to put in Mr. Bieniewicz's numbers and you are
> going to do it today."

(Def.'s Mot. Summ. J., Ex. 15.)

That afternoon, Hudson placed Beshir on indefinite paid administrative leave. (Def.'s SMF ¶ 65.)   On October 23, 2007, Hudson issued a Notice of Proposed Suspension, in which he proposed suspending Beshir for ten days based on two charges. (Id. ¶ 70.)   The first charge was "inappropriate behavior," consisting of three specifications: (1) placing her hand in front of a coworker's face in a manner that "scar[ed]" her[4]; (2) refusing to make revisions to the information collection packages in contravention of her supervisors' orders; and (3) disputing guidance and directions from OMB and DOI regarding information collection packages.   (Id. ¶ 71.)   The second charge was "inappropriate remarks," based on two of Beshir's statements:  (1) stating, "You are gonna pay for what you did to me.  You are gonna get yours"; and (2) stating, "Get the hell away from me!" to a coworker.  (Id. ¶ 72.)

Beshir submitted her response to the Notice on October 30, 2007.  (Id. ¶ 73.)   As to charge one, in relevant part, Beshir maintained that the orders she was given were "illegal" and "impossible to implement," and denied that she behaved inappropriately. (Def.'s Mot. Summ. J., Ex. 13, "Beshir's Response to Notice of Proposed Suspension

---

[4] The Notice of Proposed Suspension indicates that on the morning of September 26, 2007, Sally Spencer from the Wild Horse and Burro Division reported that Beshir "came into her office and asked if she was the one who had made contact with three past adopters."  (Def.'s Mot. Summ. J., Ex. 12, "Notice of Proposed Suspension.")  After Spencer explained to Beshir that she had been asked to contact adopters "to get the information collection documents processed," Beshir "proceeded to put her hand close to Spencer's face and told her that there wasn't any reason for her to contact those people" and that "there was more information that had to be gathered."  (Id.)  The Notice of Proposed Suspension states that after Spencer told Beshir that she "was just doing what she was told to get the form approved," Beshir " again put [her] hand close to [Spencer's] face signaling for her to stop talking and listen to [Beshir]."  (Id.)  Spencer told Beshir that she was "scaring her."  (Id.)  The Notice states that Beshir told Spencer that she would come back and speak to her supervisor, but Beshir never returned.  (Id.)

dated Oct. 30, 2007" ("Beshir's Response to Notice"), at 2-3.)  With respect to charge

two, Beshir did not deny the second specification, but explained that, following her

argument with Hudson, "I just wanted to be left alone and did not want [the coworker]

seeing the state I was in, so I did quietly say 'Get the hell away from me.'"  (<u>Id.</u> at 4.)

Beshir objected to the first specification of charge two as follows:

> I told Mr. Hudson to get out of my cubicle because I didn't
> want to fight with him anymore.  I was just so tired of
> arguing and getting yelled at, I just couldn't take it anymore.
> As he was walking away I was muttering to myself and he
> was about two cubicles away when I said to no one in
> particular and not in a loud voice, "They will all have to pay
> for what they've done to me."  I was referring to all the
> actions over the previous weeks by everyone cited in my
> EEO complaint . . . . Mr. Hudson either misunderstood me
> (which is possible since he could not have heard me very
> clearly) or he is intentionally misrepresenting what I said.  I
> did not say "you" and was not threatening him.

(<u>Id.</u>)

By a memorandum dated December 12, 2007, Johns sustained Hudson's

proposed suspension, but reduced the period of suspension from ten days to five, in

light of Beshir's "32 years of federal service without any prior history of formal

disciplinary action."  (Def.'s Mot. Summ. J., Ex. 14, "Memorandum from Bob Johns to

Shirlean Beshir Regarding Decision on Proposed Suspension dated Dec. 12, 2007," at

1.)  Beshir served her unpaid suspension from December 17 through December 21,

2007.  (Def.'s SMF ¶ 79.)

While Beshir was on administrative leave, Hudson made the edits and revisions

to Beshir's information collection packages himself, and submitted them to Bieniewicz,

who approved them and sent them to OMB.  (<u>Id.</u> ¶ 87.)  OMB approved the revised

information collection packages, including the packages related to the wild horses and

burros adoption program, which contained burden estimates that were substantially lower than those Beshir originally submitted.  (Id. ¶¶ 88-90.)

Beshir's Detail

In a memorandum dated December 19, 2007, Johns granted Beshir's request for a detail, assigning her to the Eastern States Office for 90 days, effective December 26, 2007.  (Id. ¶ 80.)  During Beshir's detail, the information collection duties were performed by Alexandra Ritchie, a GS-11 Presidential Management Fellow assigned to the Division of Regulatory Affairs, who was named "Acting" Information Collection Clearance Officer in Beshir's absence.  (Id. ¶¶ 82-84.)  Hudson also worked on information collection packages during Beshir's detail.  (Id. ¶ 85.)  Beshir's detail to the Eastern States Office was extended through the 2008 calendar year.  (Id. ¶ 86.)

The Instant Lawsuit

After exhausting her administrative prerequisites to bringing this action (Compl. ¶ 28), Beshir initiated this lawsuit on June 23, 2011.  Beshir asserts that she experienced disparate treatment (Count I) and a hostile work environment (Count II) based on her race and sex in violation of Title VII, and that she experienced disparate treatment based on her age, in violation of the ADEA (Count III).   On August 21, 2012, Defendant filed the present motion for summary judgment [ECF No. 15] and on June 11, 2013, the Court heard oral argument on Defendant's motion.  For the reasons that follow, the Defendant's motion for summary judgment will be GRANTED.

## SUMMARY JUDGMENT STANDARD

The Court must grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Under Rule 56,

> [a] party asserting that a material fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Once the moving party has met this burden, to defeat the motion, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." Id. at 324. Accordingly, while the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, see, e.g., Grosdidier v.

Broad. Bd. of Governors, Chairman, 709 F.3d 19, 23 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position—"there must be evidence on which the jury could reasonably find for [the non-moving party]." Anderson, 477 U.S. at 252. Moreover, the non-moving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation omitted).

The Court notes that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013). Rather, the Court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead decide only whether there is a genuine issue for trial." Id.

## DISCUSSION

By way of the instant motion, Defendant contends principally that summary judgment should be granted on all three counts of the complaint: on Count I, because DOI has articulated legitimate, nondiscriminatory explanations for each of the actions at issue, which Beshir fails to show were pretexts for discrimination; on Count II, because Beshir's allegations do not constitute legally actionable harassment under Title VII; and on Count III, because Beshir fails to establish even a prima facie case of age discrimination. In response, Beshir asserts (1) that she has identified evidence sufficient to create a triable issue of fact regarding Defendant's legitimate,

nondiscriminatory explanations; (2) that the evidence shows that Beshir experienced severe and pervasive harassment on the basis of her race and sex; and (3) that she has met her burden of establishing a prima facie case of age discrimination. Beshir's contentions are unavailing.

## I.     Disparate Treatment Based on Race and Sex (Count I)

"Title VII prohibits federal agencies from discriminating against their employees based on race or sex." McGrath v. Clinton, 666 F.3d 1377, 1379 (D.C. Cir. 2012). There are two statutory elements for an employment discrimination case under Title VII: "(i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Baird v. Gotbaum, 662 F.3d 1246, 1248 (D.C. Cir. 2011)(quoting Douglas v. Donovan, 559 F.3d 549, 553 (D.C. Cir. 2009) (internal quotation marks omitted)).

Traditionally, courts have examined Title VII discrimination claims under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 1819, 36 L. Ed. 2d 668 (1973). However, the United States Court of Appeals for the District of Columbia Circuit has made clear that, in a disparate treatment case, the Court is not required to engage in the McDonnell Douglas burden-shifting analysis; rather,

> where an employee has suffered an adverse employment
> action and an employer has asserted a legitimate, non-

> discriminatory reason for the decision, . . . . the district court must resolve one central question:   Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, . . . [or] sex . . . .

Brady, 520 F.3d at 494;  see also Primas v. Dist. of Columbia, 719 F.3d 693, 697 (D.C. Cir. 2013) (noting the D.C. Circuit's "simple form of inquiry for discrimination cases of this sort").

Here, Beshir maintains that her employer subjected her to disparate treatment in violation of Title VII by "singling her out for errors in her work, ordering her to violate federal regulations to compensate for . . . another employee's work backlog, berating her in front of colleagues, falsely accusing her of threatening management, placing her on administrative leave, and suspending her."[5]  (Compl. ¶ 31.)  "All other Regulatory Analysts in the Division were Caucasians, and nearly all were males," Beshir contends, "and none were similarly subjected to increased scrutiny, ordered to violate federal regulations, or disciplined."  (Id.)  Defendant responds that there were legitimate, nondiscriminatory reasons for all of the actions that DOI employees took relating to the information collection clearance package dispute and Beshir's subsequent suspension.

---

[5] During oral argument, Defendant contested whether these incidents constitute "adverse employment actions" under Title VII.  In response, Beshir asserted that, in light of her five-day unpaid suspension and administrative leave, she has suffered an adverse employment action.  Beshir's arguments in this regard are well founded.  See, e.g., Greer v. Paulson, 505 F.3d 1306, 1318 (D.C. Cir. 2007) (citing Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2417-18, 165 L.Ed.2d 345 (2006) (noting that "a suspension without pay, even where an employer later provided back pay, could be 'a serious hardship' to a reasonable employee, and thus 'materially adverse'"). However, the Court need not reach a conclusion on this issue because, even assuming that Beshir suffered an adverse employment action for Title VII purposes, Beshir is unable to demonstrate that Defendant's proffered reasons for its employment actions are pretext for discrimination, as explained infra.  Cf. Johnson v. Dist. of Columbia, No. 07-1033, 2013 WL 2420820, at *8 (D.D.C. June 5, 2013) (finding that the Court need not make a determination as to whether the Plaintiff suffered an adverse employment action because the Plaintiff was "unable to clear the additional hurdle of demonstrating that the [Defendant's] asserted non-discriminatory explanation is pretextual").

(Def.'s Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 6-7.) Specifically, according to Defendant, the undisputed evidence shows that the allegedly adverse employment actions taken against Beshir were directly attributable to her insubordination and to Beshir's statement that "they will have to pay for what they've done to me," which Defendant maintains could reasonably be construed as a threat. (Id.)

Upon consideration of the record, the Court finds that Defendant has offered legitimate, non-discriminatory reasons for its employment actions. Accordingly, the Court's inquiry now turns to whether Beshir has produced evidence sufficient for a jury to find that DOI's proffered reasons were mere pretext for race or sex discrimination. See Brady, 520 F.3d at 494.

Beshir has offered no such evidence. Although Beshir conclusorily maintains that "she was subject to a higher level of scrutiny than her male, Caucasian counterparts," (Pl.'s Mem." at 9), she fails to cite any evidence in support of this contention or otherwise identify the alleged similarly situated "Caucasian counterparts" who were supposedly treated better than she was. This omission is important because Beshir's failure to demonstrate that any other employee engaged in conduct similar to hers—namely, "refusing to follow management's orders and making threatening (or arguably threatening) statements" (Def.'s Reply at 3)—prevents the Court from being able to evaluate fully Beshir's argument that Defendant subjected her to "higher scrutiny" because of her race or sex. Cf. Adair v. Solis, 742 F. Supp. 2d 40, 53 n. 12 (D.D.C. 2010), aff'd, 473 Fed. App'x 1 (D.C. Cir. 2012) (when "an employer states that it took an adverse employment action due to the plaintiff's misconduct, the plaintiff's

comparator must have been charged with a comparable offense and then treated less harshly than the plaintiff").

Beshir's other race- and gender-related assertion—that there is "a general animus toward African-American women" in BLM (id. at 9)—is similarly conclusory and likewise unsupported. Beshir makes this assertion based solely on a single statement that an unidentified employee made "in or around 2007" on a teleconference with other BLM employees in which the speaker allegedly said (in regard someone other than Beshir) "that must be that stupid black woman." (Id.) The probative value of this evidence is obviously and significantly limited. Beshir has not identified the employee who allegedly made the statement or even the date on which the statement allegedly was made. Beshir also fails to allege that this statement was made in reference to her or any other identified BLM employee, and she fails to link this statement to any of the decision-makers who are the purportedly discriminatory actors in her case. Consequently, even though this evidence relates to race and gender, it is plainly insufficient to establish that Beshir's supervisors intentionally discriminated against Beshir on the basis of her race or sex. See Aliotta v. Bair, 614 F.3d 556, 570 n.6 (D.C. Cir. 2010) (observing that "stray remarks of nondecisionmakers are not sufficient, standing alone, to raise an inference of discrimination" (quoting Bevan v. Honeywell, 118 F.3d 603, 610 (8th Cir. 1997)) (quotation marks, ellipses, and alterations omitted)).

Beshir's assertion that her supervisor's actions in response to her allegedly threatening statement were pretext for discriminatory animus fares no better. (Pl.'s Mem. at 10-11.) Beshir suggests, first of all, that the Notice of Proposed Suspension was pretextual because it was inaccurate. The Notice charged Beshir with saying, "you

are gonna pay for what you did to me. You are gonna get yours," (Def.'s Mot. Summ. J., Ex. 12, "Notice of Proposed Suspension"), when, according to Beshir, she actually said "they" instead of "you" (Pl.'s Mem. at 10-11), and instead of directing this statement at Hudson personally as the Notice indicates, Beshir generally intended to express "her desire to make sure those who had been discriminating against her were made to take responsibility for their actions through the EEO process." (Id.) The Court struggles to see how Beshir's subjective intention regarding the statement—which she admits to having made—has any bearing on whether the resulting administrative leave and suspension was discriminatory. Regardless of Beshir's intended audience or whether Beshir said "they" or "you," it was reasonable for Beshir's supervisor to construe this comment as a threat and to act accordingly.

Undaunted, Beshir argues that "the facts are in dispute about whether or not management reasonably believed that [her] actions were threatening." (Pl.'s Mem. at 10.) But a nearly contemporaneous written account confirms that the supervisor who heard Beshir's statement construed it as a threat (see Def.'s Mot. Summ. J., Ex. 15, "Hudson Email of October 4, 2007"), and in any event, Beshir fails to point to any evidence that creates a genuine dispute as to the genuineness or reasonableness of her supervisor's stated beliefs. (Pl.'s Mem. at 10-11); see Musick v. Salazar, 839 F. Supp. 2d 86, 97-98 (D.D.C. 2012) (finding that whether the plaintiff in fact made threats of violence was "irrelevant" because "[t]he question is not whether the underlying conduct occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying conduct occurred" and that defendant was entitled to summary judgment because plaintiff "provided no evidence to create a genuine dispute regarding

whether . . . [the employer] honestly and reasonably believed that [the plaintiff] made threatening statements . . ."); cf. Brady, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.")

In a similar vein, Beshir's repeated contention that she was justified in declining to follow her supervisor's orders because "management continued to urge [her] to do something that was clearly against OMB policy and that [she] was certain was illegal," (Pl.'s Mem. at 10), even if taken as true, is beside the point. Faced with a motion for summary judgment, Beshir bears the burden of demonstrating that there is "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of race or gender. Brady, 520 F.3d at 494. If anything, Beshir's steadfast refusal to comply with her employer's request supports, rather than rebuts, Defendant's asserted non-discriminatory reasons for taking responsive action. Moreover, and in any event, Beshir's attempt to characterize her own behavior as fully justified has nothing to do with race or gender and thus provides no basis for any inference that her supervisors' response to her insubordination was discriminatory.

In the final analysis, the record in this case demonstrates that, far from acting in a pretextual and discriminatory fashion, Defendant's actions were a reasonable and non-discriminatory response to Beshir's refusal to do what her supervisors requested. It is undisputed that Beshir's supervisors believed that her burden estimates were too high

and instructed her to lower her estimates, but rather than following her supervisors' direction, Beshir flatly and repeatedly refused to make the required changes. (Pl.'s SMF ¶¶ 20, 48-50.) There is no record evidence that indicates that the Defendant had other motives for putting Beshir on administrative leave and suspending her, much less that this reaction to Beshir's non-compliance was driven by discriminatory animus. Accordingly, the Court finds that Beshir has not set forth sufficient evidence for a reasonable jury to conclude "that the employer's asserted non-discriminatory reason was not the actual reason" and that Defendant discriminated against Beshir on the basis of her race or sex, and the Defendant's motion for summary judgment as to this count will be granted. See Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) ("[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."); see also Brady, 520 F.3d at 496 n. 4 (noting that, even if the plaintiff showed that an allegation of sexual harassment "was not the actual reason for his demotion, he still would have to demonstrate that the actual reason was a racially discriminatory reason").

## II.    Hostile Work Environment Based on Race and Sex (Count II)

Beshir also brings a claim for "hostile work environment based on race and sex" in violation of Title VII. (Compl. ¶¶ 32-35.) To succeed on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift

Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id. "In addition, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . because of' the employee's protected status." Peters v. District of Columbia, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998)). "It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Lewis v. District of Columbia, 653 F. Supp. 2d 64, 80 (D.D.C. 2009) (quoting Bryant v. Brownlee, 265 F. Supp. 2d 52, 63 (D.D.C. 2003)). Accordingly, this Court has noted that "[t]he standards for finding a workplace illegally hostile are sufficiently demanding to ensure that Title VII does not become a general civility code." Brooks v. Grundmann, 851 F. Supp. 2d 1, 6 (D.D.C. 2012) (citations and internal quotations omitted).

Beshir contends that "her supervisors berated her about her work performance, demanded that she violate federal regulations, humiliated her in front of colleagues, and falsely accused her of threatening her supervisor," and thereby subjected her to a hostile work environment for the purposes of Title VII. (Compl. ¶ 35.) Defendant moves for summary judgment as to this claim on the grounds that Beshir's asserted factual predicate for her hostile work environment claim does not, as a matter of law, rise to

the level of "severe and pervasive" harassment actionable under Title VII.  (Def.'s Mem. at 10-12.)  Defendant asserts further that there is no evidence in the record linking any of the purported harassment to Beshir's race or gender.  (Id. at 12-13.) Defendant is correct in both respects.

After reviewing the "totality of the circumstances" presented by this case, see Baloch, 550 F.3d at 1201, the Court cannot find that Beshir's alleged experiences of (1) being "yelled at on a daily to weekly basis and often in front of her colleagues," which "caused [her] to seek medical attention on an almost daily basis"; (2) being subject to "aggressive[ ] pressure[ ]" to "violate federal regulations," including "threat[s] to thwart her career advancement"; and (3) being "accused of threatening her supervisor and suspended"  (Pl.'s Mem. at 12-13), amount to a hostile work environment for the purpose of Title VII.  It is well established that a hostile work environment under Title VII arises from conduct that "permeates" the workplace "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21.  Here, even when viewing the facts in the light most favorable to Beshir and taking as true her experiences of being "yelled at," "pressured," and "humiliated," the Court cannot find that these unpleasant experiences constitute the type of hostile and abusive workplace environment contemplated by a valid hostile work environment claim.  See Franklin v. Potter, 600 F. Supp. 2d 38, 77 (D.D.C. 2009) (concluding that a hostile work environment was not sufficiently established even though the "employee and his immediate supervisor repeatedly butted heads," "the supervisor frequently yelled at [the employee] during discussions about his work," and

"the supervisor threatened [the employee] with job-related consequences for his refusals to meet workplace expectations") (internal quotation marks and citations omitted); see also Dudley v. Washington Metro. Area Transit Auth., No. 11-1447, 2013 WL 617024, at *26 (D.D.C. Feb. 20, 2013) (discussing "[a] litany of cases show[ing] that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim"); Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 56-57 (D.D.C. 2004) (finding that "[c]riticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting" and the fact that the plaintiff "may have been shut out of certain meetings, denied travel opportunities and other perks, and spoken to in a condescending manner, although perhaps disrespectful and unfair, also does not mean that [the plaintiff] was subjected to an illegal hostile work environment").

Moreover, the undisputed evidence shows that Beshir's negative interactions with her supervisors were not random, unexpected, or unceasing; rather, the purportedly hostile experiences were directly related to Beshir's intermittent refusal to comply with her supervisors' instructions. See, e.g., Baloch, 550 F.3d at 1201 (finding that, while plaintiff "clearly had several verbal clashes with his supervisor in the workplace," plaintiff's "allegations of insult [were] undercut by the legitimate reasons and constructive criticism offered in the letters of counseling and reprimand," his "assertion of pervasive and constant abuse is undermined by the sporadic nature of the conflicts," and "the totality of circumstances . . . d[id] not rise to the level necessary to support a hostile work environment claim"). This is not a case in which an employee found herself perpetually subjected to the wrath of others in the workplace through no fault of

her own and without any clear explanation other than discriminatory animus. Quite to the contrary, the undisputed facts show that the purported harassment that Beshir allegedly experienced occurred as a result of, and in response to, Beshir's own conduct.

What is more, Beshir has failed to link any of the allegedly hostile workplace experiences to her race or sex and, therefore, has failed to demonstrate the kind of "<u>discriminatory</u> intimidation, ridicule, and insult" that is necessary to sustain her claim. <u>See</u> <u>Harris</u>, 510 U.S. at 21 (emphasis added; internal quotation marks omitted); <u>Lewis</u>, 653 F. Supp. 2d at 80 (noting that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination"). While Beshir alleges that she faced a "higher level of scrutiny" because of her race and sex and that her work environment could be characterized by an "animus towards African American women" (Pl.'s Mem. 13), there is little, if any, record evidence to support either of these contentions, as described above. And without such evidence, Beshir's hostile work environment claim fails. <u>See</u> <u>Baloch</u>, 550 F.3d at 1201 (considering as part of the totality of the circumstances that "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability—unlike in some hostile work environment cases").

In sum, upon review of the entire record, the Court cannot conclude that Beshir's experiences rose above "the ordinary tribulations of the workplace" to constitute the type of abusive discriminatory conduct necessary to sustain a hostile work environment claim, <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) (citation and internal quotations omitted), nor has Beshir

successfully linked her negative workplace experiences to any evidence of discrimination based on her race or sex. Accordingly, the Court grants Defendant's motion for summary judgment as to this count.

## III.   **Beshir's ADEA Claim (Count III)**

Finally, the Court concludes that Beshir's allegation that she was subjected to age discrimination in violation of the ADEA is similarly flawed—and it suffers the same fate as her Title VII claims. Under the federal-sector provision of the ADEA, "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). The two "essential elements" of an age discrimination claim are that (1) the plaintiff suffered an adverse employment action (2) because of the plaintiff's age. Baloch, 550 F.3d at 1196. As with Title VII claims, an "adverse employment action" in the ADEA context is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Aliotta, 614 F.3d at 566 (quoting Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks omitted). An ADEA plaintiff can establish liability under Section 633a either by "mak[ing] use of the McDonnell Douglas evidentiary framework to establish that age was the but-for cause of the challenged personnel action"[6] or by "showing that age was a factor in the challenged personnel action." Ford v. Mabus, 629 F.3d 198, 207 (D.C. Cir. 2010).[7]

---

[6] Under the McDonnell Douglas framework, an ADEA plaintiff has the initial burden of making out a prima facie case, which means that "she must prove by a preponderance of the evidence that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir.

Beshir, who was fifty-one years old at the time of the events detailed in the Complaint (Def.'s SMF ¶ 2), maintains that she experienced an adverse employment action because of her age in violation of the ADEA. (Pl.'s Mem., at 14-15.) The gravamen of Beshir's contention is that Defendant "created a GS-5 position for a twenty-two-year-old Caucasian female" and "assigned that position Beshir's information clearance officer duties." (Compl. ¶ 38.) Although Beshir asserts that she can succeed on her age discrimination claim "because changing [her] position into a lower grade position in connection with placing [her] on a much lower grade detail is an adverse action," and "because [her] job function[s] were taken over by a younger person" (Pl.'s Mem. 14-15), the Court is not persuaded that a reasonable jury could find that Beshir experienced an "adverse employment action" under the circumstances presented by her ADEA claim.

First of all, it is undisputed that Beshir specifically requested a detail out of the Division of Regulatory Affairs (Def.'s SMF ¶ 54; Def.'s Mot. Summ. J., Ex. 1 at 19)—

2006) (citation and internal quotation marks omitted). Once the plaintiff establishes a <u>prima facie</u> case, the employer "bears the burden of producing a non-discriminatory explanation for the challenged personnel action." <u>Ford v. Mabus</u>, 629 F.3d 198, 201 (D.C. Cir. 2010). Following the employer's articulation of a non-discriminatory explanation for the employment action, the plaintiff "may satisfy its burden either indirectly by showing the employer's reason is pretextual or directly by showing that it was more likely than not that the employer was motivated by discrimination." <u>Id.</u> (internal citations and quotation marks omitted). "Although the intermediate evidentiary burdens shift back and forth under the <u>McDonnell Douglas</u> framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Gold v. Gensler</u>, 840 F. Supp. 2d 58, 66 (D.D.C. 2012) (internal quotation marks omitted).

[7] The Court recognizes that <u>Brady</u>'s methodology applies to ADEA claims. <u>See, e.g.</u>, <u>Peyus v. Lahood</u>, No. 11-02087, 2013 WL 358180, at *4 (D.D.C. Jan. 29, 2013) (noting that if an employee has suffered an adverse employment action and the employer asserts a legitimate, non-discriminatory reason for the action, "the Court need only determine at the summary judgment stage whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, [age], or national origin ") (alteration in original); <u>Lurie v. Mid-Atlantic Permanente Med. Grp., P.C.</u>, 729 F. Supp. 2d 304, 316 n. 2 (D.D.C. 2010) (noting that "this Court and the other courts of this district have regularly extended <u>Brady</u>'s methodology to claims under the ADEA"). However, the Court also notes that aspects of the <u>McDonnell Douglas</u> burden-shifting analysis nevertheless provide a useful framework for analyzing age-discrimination claims where there is no direct evidence of discrimination. <u>See, e.g.</u>, <u>Ford</u>, 629 F.3d at 207.

a fact that casts doubt on her subsequent contention that the detail assignement was somehow "adverse." Moreover, Beshir has not demonstrated that when she received her requested detail and she was sent to the Eastern States Office effective December 26, 2007 (Def.'s SMF ¶¶ 80-81), she experienced a significant change in her employment status. "Courts in this district regularly conclude that personnel actions do not constitute adverse actions where the plaintiff has shown no effect on her grade or salary level, job title, duties, benefits or work hours." Bloom v. McHugh, 828 F.Supp. 2d 43, 57 (D.D.C. 2011). In addition, the record does not support the contention that Beshir was unfairly surprised, or otherwise adversely affected, by the fact that a lower-grade employee was assigned to assume her responsibilities. It is undisputed that Johns and Hudson specifically informed Beshir that the BLM's information collection duties would not transfer with her while she was on detail. (Id. ¶ 54.) And the fact that a GS-11 employee was designated "Acting Information Collection Clearance Officer" to necessarily perform Beshir's duties in her absence (id. ¶¶ 80, 84-85) falls far short of establishing that Beshir experienced a significant change her employment status, as required to support her discrimination claim. See Aliotta, 614 F.3d at 566.

Nor can Beshir establish that she suffered an "adverse employment action" based on allegations of subjective emotional harm. When asked about her age discrimination claim at her May 2008 deposition, Beshir asserted that her ADEA claim was rooted in the "total disrespect" that Beshir felt based on her perception that the Agency permitted a lower-grade employee to complete the duties that she had been performing. (Def.'s Mot. Summ. J., Ex. 2, "May 30, 2008 Beshir Dep.," Tr. 206:2-12.) Beshir's subjective feelings of "disrespect" do not qualify as "adverse employment action" for the purposes

of an ADEA claim.  See Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002)

("Purely subjective injuries, such as dissatisfaction with a reassignment . . . or public

humiliation or loss of reputation . . . are not adverse actions"); Stewart v. Evans, 275

F.3d 1126, 1135-36 (D.C. Cir. 2002) (noting that "public humiliation or loss of

reputation does not constitute an adverse employment action"); see also Peyus v.

Lahood, No. 11-02087, 2013 WL 358180, at *5 (D.D.C. Jan. 29, 2013) (noting that

"public humiliation or loss of reputation" are the kinds of slights "that our Court of

Appeals has consistently classified as falling below the requirements for an adverse

employment action").  The Court of Appeals in this Circuit has consistently

admonished that "not everything that makes an employee unhappy is an actionable

adverse action," Baird, 662 F.3d at 1250 (citation and internal quotation marks

omitted), and Beshir has not pointed to any evidence showing that she suffered anything

beyond subjective harm to her dignity, let alone the "significant change in employment

status" required to support her ADEA claim.[8]

Beshir also fails point to any evidence that demonstrates that her age was a

relevant consideration in any of the purported adverse employment actions.  Beshir's

only allegation that in any way relates to age is her assertion that she was replaced with

someone younger.  (Compl. ¶ 38; Pl.'s Mem. 14-15.)  However, as Defendant points

out, Beshir admitted during her 2008 deposition that she did not know whether her job

functions had been taken over, let alone taken over by someone younger:

> Q:  Let me shorten this.  The bottom line is you are
> claiming your job functions have been taken over by a
> younger person.

---

[8] Similarly, to the extent that Beshir argues that she suffered an "adverse employment action" because she was "plac[ed] on a much lower grade detail," she fails to point to any evidence to support this statement.  (See Pl.'s Mem. 14-15.)

|     |                                                                                      |
| --- | ------------------------------------------------------------------------------------ |
| A:  | No, they weren't. As far as I know, they didn't fill the job but my duties that I had been doing which is supposed to be a 13-14, as total disrespect, they had taken that responsibility to try to justify a GS-7 and they put my function in that GS-7 job. |
| Q:  | But that position was never filled?                                                  |
| A:  | Not to my knowledge . . . .                                                           |

(Def.'s Mot. Summ. J., Ex. 2, "May 30, 2008 Beshir Dep.," Tr. 206:2-12.) Beshir's own testimony plainly contradicts her claim that she experienced age discrimination by virtue of actually being replaced by someone younger, and to the extent that Beshir claims that Defendant violated the ADEA when Defendant "created a GS-5 position for a twenty-two-year-old Caucasian female," (Compl. ¶ 38), Beshir fails to demonstrate how such action, even it true, gives rise to an inference of discrimination in this case.

Nothing in the record comes close to establishing that age was a relevant consideration in Defendant's employment actions regarding Beshir, and absent any connection between Beshir's age and Defendant's actions, Beshir is unable to demonstrate that she suffered age discrimination in violation of the ADEA. See Ford, 629 F.3d at 206 ("emphasiz[ing] that the consideration of age must have some connection to the challenged personnel action"). The Court therefore concludes that Defendant's motion for summary judgment must be granted as to this count as well.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [ECF No. 15] will be **GRANTED** as to all counts. An appropriate Order accompanies this Memorandum Opinion.


DATE: August 16, 2013

*Ketanji Brown Jackson*
Ketanji Brown Jackson
United States District Judge